Good morning Judge Prado, Judge Clement, Judge Elrod. May it please the court, my name is Alfonso Kennard and I'm here on behalf of Jorge Aviles. What are we looking at here ultimately? We're looking at whether or not there was jurisdiction. In so deciding whether or not there was jurisdiction, we have to decide whether or not the WPEA was ignored, was a non-frivolous allegation made. That's ultimately what we have to decide, what this court needs to decide in order to establish whether or not jurisdiction existed at the Merit Systems Protection Board level. We, of course, assert that jurisdiction was in place and unfortunately the Merit Systems Protection Board never got into the actual merits, did not get into the next layers of analysis required that would otherwise be required of it to ascertain what really happened here. Now whatever the issue is with Exxon, that's not my beef, that's not my fight. If the federal government wants to subsequently decide whether or not in fact they were defrauded in the form of not getting taxes owed to it, then that is certainly within their prerogative moving forward. That's not why I'm here today. I'm simply here today to establish whether or not my client was in fact retaliated against for having raised these issues. So what does he want? His job back? He wants damages? What are we looking for? Ultimately he's looking for reinstatement and back pay and attorney's fees. Ultimately in an ideal world he would be . . . Reinstatement, back pay and attorney's fees? In an ideal world, in an ideal situation, he would like to be reinstated to his previous position and to the extent that he has not fully mitigated his damages, would be seeking the back pay that he would otherwise have been entitled to. But for our purposes, all we want is just to go back to the board for them to do an actual . . . they can address the merits of the case. They got out because, well . . . So you don't want the attorney's fees and the damages, you just want them to go back and investigate the . . . Well, A, we would ask, to the extent this court would be so inclined to do so, we would ask for that. But ultimately and alternatively we would ask that this be remanded back to the Merit Systems Protection Board level in order to take a good look on the merits. We didn't get that far. Now ultimately we believe that the WBPA was not applied here. What was the purpose of the WBPA, the Whistle Blower Protection Enhancement Act? It was to strengthen the rights and protections of federal whistleblowers. Well, what ultimately constitutes a claim under the WBPA as an amendment to the WPA? Well, was a personal action made because of any disclosure? The operative word here is any disclosure. It went before it was a disclosure. Now it's . . . It has to be a non-frivolous, right? Correct. And well, what is a non-frivolous? Well, we believe that . . . all the arguments that we've seen through the intervener and through the Board's attorneys have been that, hey guys, this was something that some private entity did, not us, the government. This was strictly something that, if anything, would have been done by a private entity and that doesn't rise to the level of protection because the government didn't do anything wrong, if anything. Would you agree, if that were the case, that everybody in IRS did their job and it was Exxon that was the problem, would the Whistle Blower Statute apply? If that was the case, but that was not the case here. Okay, but you would concede that if that was the case, there would be no . . . Sure. If they did everything they were supposed to do, we wouldn't be here to argue. You're not arguing that the claim against Exxon is enough based upon the amendments in 2012. That's absolutely right. The government has independent liability here and it's important to note that we have to look at the good name of the government. We have to look at . . . That would be a stretch. Well, I mean, if they want to let 500 million dollars in taxpayer money go, I think that would implicate the government's agency's good name and their reputation and their reputation. Now, we're not, again, here saying that that actually happened. At least, I'm not saying I went there. I couldn't tell you one way or the other. All I know is that my client reported this to the Inspector General, to the OSC, and he was told, you need not say this to anybody else. Okay, so do we need to address, in an opinion that we write, whether or not Exxon's liability alone is a basis for jurisdictional complaint? The basis of our jurisdictional complaint is that the government independently was engaged in wrongdoing, whether they were complicit in the actions of this private employer, whether they grossly mismanaged their ability to enforce the laws. What is gross mismanagement? I think that's another key point here. It's any management action or inaction that creates a substantial risk of significant adverse impact on the agency's ability to accomplish its mission. Well, what is the mission of the Internal Revenue Service? It is to ensure that people and entities are paying their taxes, and I could defer to my friends who were here earlier that know more about the tax laws than I do, but ultimately, its mission is to enforce the tax laws, make sure that entities are paying their taxes. Well, here, uniquely, the employer is the IRS, and where they do not or where they fail to ensure that that's happening, that's a problem. That's what my client was doing. He risked his own personal well-being. He knew that if he raised this alone, that he would potentially be subject to retaliation, which he ultimately was. At what point do we say it's a discretionary decision by IRS as to whether money is owed or not? We have to get to the point of it's fraud and wrongdoing, some serious allegations against government employees. It can't just be a discretionary decision based upon rules and regulations. Oh, they don't owe this money, or yes, they do, and reporting that. It has to go a step beyond that to show that the money really is owed, and someone in IRS is responsible for that. Well, I think we don't have to look at . . . you don't have to have specific statements, where there are statements of this wrongdoing. Though unspecific, they do satisfy the requirements under the Coons analysis. So in Coons, it specifically states that even if it's not with specificity, it still rises to the level of being covered under the jurisdictional argument. I think, Judge Prado, what you're saying gets more into the actual merits of the case, the actual nuts and bolts, but we didn't get that far, and we would have been able to go in and delve further into it, but the MSPB just carte blanche decided that there wasn't even enough to show that the jurisdiction existed, and those are the types of things that we would have gotten into. That had to be in your complaint, making those allegations. Sure, and what she did, he complained that he raised it on multiple levels, including, as I stated earlier, to the Inspector General, to the OSC, and to his supervisors, who, one, he believes did nothing. Now, of course, they do assert in their brief that some unidentified additional compliance agents went in and did an independent analysis and found that what he was claiming was not true. Okay, where does it say in Coons that you can be vague and detailed and told who at the agency was in cahoots, allegedly, with the wealthy taxpayer, and that's a much more specific case, isn't it? Well, I'm sorry, specifically to some of the verbiage that came from Coons. Okay, where in Coons does it say that even a vague . . . I thought you just told Judge Prado that Coons says something vague in general is good enough? Do you want to wait and tell me on your rebuttal so you don't use your time? That would be . . . All right, so in Coons, we look at 19 with regards to the statements that Coons disclosed to investigators from the Office of the Inspector General, similarly to how Mr. Aviles made claims to investigators from the Office of the Inspector General. Here, IRS senior officials interfered in some cases of wealthy or influential taxpayers, resulting in preferential treatment. Coons admits that he did not tell the agents who was giving or receiving the alleged preference or any other details. He also admits that he did not pursue the matter further with the Office of the Inspector General. However, these statements, though unspecific, do satisfy the requirements of the When the board said Coons were detailed and specific, including that a former regional counsel was using his influence to corrupt the IRS and that vague allegations of cover-up do not rise to this level, you think that's a misinterpretation of Coons? I think they're taking liberties there. I think it's clear from the opinion itself that the court found that, hey, he made certain things, but what he did say still rose to the level of being protected and protectable. What specifically do you say? That what, when, where, and how? What is the, what do you have in there? As it pertains to Mr. Aviles, we've got a towel on him. Allegations of cover-up, I think that's what we're interested in. Right, in terms of the cover-up, he made it, he made it known that he thought that, A, this was happening, B, that once he raised the alarm that it should have been investigated, and he believed that it was not. Well, so let's, let's talk about what did happen. So on June 21st, 2010, he filed a Form 11 with the OSC for the agency altering his work conditions and reduced pay. So later, after he raised the alarm, they reduced his pay, they altered his work conditions, so he filed a Form 11 on June 21st, 2010. The very next day, it was proposed by the agency that he'd be the OSC complaint. By November 16th of 2010, just four days later from that, he was terminated. So you're saying those acts, the suspension, the termination, are part of the cover-up? Right, because then he could no longer be there to look into it further himself. His, all his access was denied. What allegations did your client make before, I mean, the cover-up should have happened before this, before he gets fired and suspended, if he's complaining about something. Sure, but. So what, you're talking about retaliation, what were the allegations made by your client as to the wrongdoing by the IRS participating in a cover-up? That, this was grossly mismanaged. Again, this, he's not, he's at a certain level, you know, we're. But were there specifics, names? His specifics were that he believed that $500 million was not being paid that should have otherwise been paid by this private entity to the federal government. And without going further into his analysis, I couldn't begin to properly, not being an accountant, describe to you the nuts and bolts. No, but we're not asking about why the amount was, that the accounting issue is not, we're asking for the specifics about what the people at the agency were doing to make sure that the $500 didn't have to be paid. What does he say in his complaints that shows that people were doing something at the agency? At the agency level. Okay, that goes back to my previous statement. He's at a certain level. He only has so much access. He's on-site, he's looking at things. Sometimes you don't know exactly what it is you don't know. You know in your limited amount of training what, that something is wrong here. So his diligent efforts were to take it that next level, seeking assistance of individuals he thought would assist him in delving into this issue. So where the government, but now of course they're asserting that we had independent folks look into it, again that goes more to the merits of the case, where they did not, and he's making the claim that they did not, that they didn't sufficiently go in and evaluate what he was claiming. In so doing, again we believe that that... Did he name names? Did he name names? I don't, I don't have those names. He's your client. Aside from, aside from the individuals that, he raised the issues internally to his supervisors. So his supervisors were made aware. And where his supervisors, and I'm sorry I misunderstood if you mean names of folks. At the agency who were engaged in helping Exxon. Sure, so he, he, he spoke to Joe Sullivan. Not the people he complained to, the people he's complaining about. Well ultimately they become, they become the problem. They become the problem where they don't, they don't do anything about it. They're not part of the initial people who were helping Exxon avoid payment of this tax. You're saying, hey you guys go investigate. There's something happening here. But you need to say, hey go investigate Mr. Smith and Mr. Brown because they're helping Exxon hide the money, or not pay the taxes. But did you ever tell anyone that? Who to investigate or who to target? I don't have that information. But are you the lawyer who filed the complaint? Sure, this was, but this was ultimately, he did initially file pro se. It's what, ultimately what the government didn't do later. That we said, I believe without the specificity you're asking me for here now, that the agency is complicit in this and must be complicit if, if, if I'm correct in this, this amount of money is, is really missing. How could they not be? And we need to look into it further. I see that I'm out of town. I'll reserve the rest of my statements for rebuttal. Thank you. Good morning. May it please the court. My name is Katrina Lederer, representing the Respondent Merit Systems Protection Board. We agree with petitioner's assessment of this case in that his requirement to prove the board's violation of law occurred, but that the government's interests or reputation were implicated in that violation. This is somewhat different from what he alleged in his brief, but we certainly agree that that's the state of the law. I noticed that too. So the issue then that we are arguing today is whether what he alleged to the Office of Special Counsel and the MSPB was sufficient to be a non-privilege allegation of government involvement in these alleged violations of law. We think it's clear that the statements he made to OSC and the board did not rise to that level. They were basically very vague and conclusory, which the existing precedent says is not enough to constitute a non-privilege allegation. Where does it say that? Well, the case law, the board case law, for example, the Rusildo case requires that disclosures must be specific and detailed, not vague allegations of wrongdoing regarding broad or imprecise matters. What do we do with the Ninth Circuit, though? The Coons case that Petitioner mentioned, we believe is distinguishable from the facts in this case. In Coons, the disclosures, as we said in our brief, were much more specific. For example, Petitioner in Coons disclosed actions of a former IRS regional counsel who was allegedly interfering in a taxpayer's case and using his influence with the agency to favor that taxpayer. And the court in Coons found that the current employees of the IRS have an obligation to enforce post-employment ethics rules with regard to that person. So they were clearly involved in the violation of law. Also, there was a disclosure that IRS staff were illegally sharing information with a taxpayer's counsel. Again, that's direct involvement of current IRS staff. There was a disclosure regarding processing of a large fraudulent refund. And also, there were allegations that this person had told OIG that IRS officials were interfering in cases of wealthy taxpayers and giving them preferential treatment. So again... What do you do about the language in Coons that says that vague is good enough? I don't believe that's... Well, didn't he just read from it? That's not the overall holding of Coons. Clearly from the facts in Coons... You think it might say that, but in Coons, the facts were more specific than that here. The facts were much more specific than here. Here, we just have an allegation that Exxon is committing $500 million in tax fraud and agency officials were, quote, covering it up. That's it. That's all he said, despite the administrative judge seeking more information from him about his jurisdictional claim. He declined to provide any. He didn't provide any more detail to the board. So, I think that sort of just barren conclusory allegation is exactly the thing that the word non-frivolous was intended to screen out. You can't just make any allegation of wrongdoing. You have to say what happened with some Can you address the retaliation claim under 5 U.S.C. 2302B? Yes. That's another issue that the petitioner seems to have changed his position on between the original brief and the reply brief. In the original brief, he appeared to acknowledge that the B-9 petitioner filed his appeal. So, and that provision is not retroactive. So, the only cause of action he would have is basically an affirmative defense if he had appealed his removal, which he did not, under Section B-8. He elected not to appeal his removal. He elected to bring a complaint before OSC instead. So, under, there's an election of remedies statute that provides that you can't bring both. You have to elect either appeal your removal before the MSPB or bring an IRA claim eventually after filing with OSC. He chose the OSC route. So, he cannot now say that he is somehow implicitly appealing his removal. The timeliness of that appeal has long since passed. Either way, he didn't, you're required to appeal it within 30 days of the action. He didn't file his OSC claim until, I think, like two and a half years after he was terminated. So, also, the separate issue is he never raised this claim before the board or before the administrative judge. So, either way, he would be precluded from raising it for the first time before this court. But didn't he raise something of the sort before the Office of Special Counsel complaint? I mean, was it that sort of this claim? Well, he did allege retaliation based on his whistleblowing, which is different from retaliation based on the act of his filing with OSC, which is what B-9— Well, it's the same based upon the whole thing. I think read broadly, it's arguably not— But I believe that he is trying to argue that he has separate course of action under B-9, which deals with retaliation for the very act of filing OSC. Rather than the substance of a whistleblowing disclosure claim, which a substance of his allegation that he was a whistleblower and then he was retaliated against, which we agree is the claim that he's bringing here today. If we find that that's not frivolous on its face, then do we need to remand? Yes. The proper remedy would be a remand because the board did not have an opportunity to consider the merits of this claim. So if this court does agree that he deserves a shot to prove his case, then the board should have a chance to rule on those issues. So what is the—can you give me succinctly, again, why you believe that it shouldn't be remanded? Well, it shouldn't be remanded because he doesn't have an independent cause of action under B-9 because that provision was instituted by the WPEA, which was not in effect at the time that he filed his claim. I don't know if you're asking about the B-8, the affirmative defense to his removal. He did not appeal his removal, so— The B-9, can it apply—if it wasn't in effect at the time he filed his claim, but could it apply to conduct that hasn't yet been adjudicated? Yeah, that provision is not retroactive, so although some provisions of a WPEA are, and the case that sets that out is called Miller. And the site for that is— So the B-9 claim is precluded because it was not retroactive and it wasn't in effect, regardless of whether it's exhausted or not. Exactly. The Miller case, the site is 122 MSPR 3. That's a board case. So, unless the court has any other questions, we respectfully ask you to affirm the decision of the board. Thank you. I gather the lawyers from the Department of Treasury are different from the lawyers that represent the Commissioner of IRS? Correct. Yes. May it please the Court, my name is Emma Bond, and I represent the intervener, Department of the Treasury. This case should be resolved by focusing on the statutory language that Congress passed in the WPEA, which is retroactive, namely the reasonable belief provision. And that's located—it's a little bit difficult to find, actually—it's located in subsection B, and it expressly says that it applies to disclosures under subsection B-8. And it says that not only must the question of whether a disclosure is protected must be based on whether the actions of the government evidence misconduct. Not only that, but it also specifies that the appropriate question regarding whether an employee reasonably believes that his disclosure evidence is misconduct is whether a disinterested observer with knowledge of the essential facts could reasonably conclude the misconduct occurred. So applying that standard to this case, the disclosure of Exxon's tax—alleged tax fraud alone doesn't identify any actions of the government. It's simply actions of a private party. And furthermore, the allegation, the kind of plus government cover-up, this conclusion of government cover-up is simply just that, a conclusion. It doesn't identify the essential facts based on which a reasonable person could conclude the misconduct occurred. And therefore, it's not enough, even at the jurisdictional stage, because the Whistleblower Protection Act is not a disclose first, investigate later. I believe in his argument, the petitioner mentioned that he says, well, the employee only has so much access, so he believed that there may be something fishy going on here. But Congress did impose this burden on employees. Although there's broad protection when there is a protected disclosure, the employee must reasonably believe that this disclosure occurred based on specific facts. It can't be just—it has to be more than just a feeling or a hunch. And indeed, even though Congress in the WPEA was very explicit that it was intending to expand the scope of the protections, of a protected disclosure, the Senate report also said that it was relying on this non-frivolous allegation standard and on the reasonable belief provision in particular, in its own words, to screen out frivolous claims. We don't need to rely upon these reports in order to hold for your client, do we? No, not at all. The plain language of the statute does expressly require reference to the actions of the government. And noticeably, although Mr. Aviles appears to make a plain language statutory argument in his opening brief, that is noticeably absent in the reply brief, and nor does he respond to the expressed statutory provision that the board first must look to the actions of the government. And there's been a lot of discussion about Coons, so I thought I would address the main reasons, in addition to what Respondent mentioned, that Coons is distinguishable from the case here. There are three basic disclosures that the Ninth Circuit and Coons found were protected. We addressed two of them at length in our brief, namely the one regarding that there was an improper disclosure by an IRS official to a former... Were names named? I mean, were there names mentioned in the Coons? As to the specific person doing wrongdoing? Well, honestly, actually, in this case, there were names named. If the Court looks I believe to his complaint to the OSC at Record Excerpt 20, there were names named here. And so we don't contend that, however, simply naming names does not identify any specific actions. It's not the names the statute requires reference to, it's the actions of the government. So just simply naming names, generally, and then saying these people did misconduct, these people engaged in cover-up. That's not enough. So I think our brief addresses, as the Respondent did, why the disclosures regarding the improper tax refund and the improper disclosure, why those are distinguishable from the case here. Mr. Aviles, in his reply, focuses on the third one where there's this nonspecific disclosure. But even there, it's at page 890, it's the Penn site, and even there the Ninth Circuit expressly cites to LaChance, it cites to the very reasonable belief test that Congress codified in the Whistleblower Protection Enhancement Act, which specifically requires reference to the essential facts known to and readily ascertainable by the employee. And so there, even though the disclosure was nonspecific, the essential facts on which that ultimate disclosure was based were specific. And so it was reasonable in Coons to conclude that tax officials had interfered, had improperly interfered, whereas here, there is no specific underlying disclosure. And Mr. Aviles appeared to have conceded in his opening argument that the tax fraud, the alleged tax fraud alone, that disclosure alone, wouldn't be enough. And we certainly agree with that. But then, when asked what the specific actions of the government are, he again points to the tax fraud. But to say that simply saying tax fraud plus some conclusory statement, that that minor addition would draw this otherwise unprotected disclosure into the protection of the WPA would really undermine and eviscerate the expressed statutory language requiring actions of the government. Also... ...that they actually did do an investigation and had other CPAs come in and check it out. Should we be considering that? Well, in our...I think the quick answer is that shouldn't be the focus. The focus should be on the disclosures themselves and what he reasonably could conclude at the time the disclosures were made. And if the Court looks at, for example, Record Excerpt 17 and 18 where Mr. Aviles really sets out what the real crux of his disclosures are at the top of Record Excerpt 17, for example, he says there's a tax fraud plus cover-up. And then when it says, how did the victim learn about the wrongdoing? He or she disclosed. And this would be the place where the employee would set forth his reasonable belief and the underlying essential facts. But all that's disclosed, essentially here, I'll paraphrase, is that he was trying to send a memo regarding concerns with Exxon and he couldn't send a memo. And so his conclusion is, I was blocked from sending a memo and therefore there's this cover-up. And that simply...a reasonable observer, considering that, would not conclude that there was wrongdoing. A reasonable observer would probably recommend calling the IT department. This would not be the sort of thing that would lead someone to reasonably conclude misconduct occurred. And so I think the fact...the dissent in the board appeared to consider the investigation as kind of a black mark against the IRS. So to the extent that it is considered, I think here it simply supports the findings that all he was doing was...that he had run his computer out of memory space. These sorts of...the results of the investigation, in fact, support the conclusion that no reasonable observer would conclude here that wrongdoing had occurred. Likewise, should we not consider that he was allegedly not showing up for work and showing up at the wrong places and all of that sort of thing and not meeting with his superiors? That's the sort of thing that if he had brought an appeal from his removal, that would be the sort of thing that the IRS would have to establish by preponderance of the evidence. That's the sort of thing that would be charged as a basis for his removal. That's just background flavor about the case. That's not something we should rely upon in deciding if his complaint is frivolous or not. Additionally, that would maybe also come into play if he did meet his jurisdictional obligation here and then the IRS had to prove by clear and convincing evidence it would have taken the same action. I see I'm almost out of time. As I mentioned, because Mr. Aviles failed to non-frivolously allege that he reasonably believed that any actions of the government evidenced misconduct, this Court should affirm the decision of the Merit Systems Protection Board dismissing his appeal for lack of jurisdiction. Yes, I want to thank Intervenors Council for pointing out because I wanted to answer your previous question about did we get any names? Of course, there were names. James Ellis, Territory Manager, Dorothy Choice, Team Manager, Jill Sullivan, International Team Manager of individuals he believed were complicit in this, what he's calling a cover-up. How were they complicit? Well, therein lies the rub. He is not required to fully label it as the OSC can be expected to know which categories of wrongdoing might be implicated. That goes back to the Tullis case. Ultimately, the cover-up itself and the instruction not to report this information is sufficient under the Board's own precedent in Rumsey. The Board panel that actually decided Rumsey was the exact same panel that decided the Aviles case here and had almost identical disclosures. They basically did the opposite here. But for purposes of benign, this can't be raised alone. However, Aviles raised it in his OSC complaint in conjunction with whistleblower appraisal under B-8 so the Board can assert jurisdiction. The Board could have asserted jurisdiction over, because he non-frivolously alleged that the agency retaliated against him for seeking corrective action from the OSC and the Board for the agency altering his work conditions and reducing his pay and retaliation for his disclosures. I've got to make sure that is also addressed here. Also going back to the discussion you had with the Intervenors Council, even if they did do an investigation and found that fraud did not happen, that's a question on the merits, which isn't proper for the jurisdictional inquiry that we're dealing with here. Moreover, with regards to the issue of whether or not the attendance issues, not meeting with managers, should have been considered, that pursuant to Johnston v. MSPB is not part of the jurisdictional inquiry. It is worth noting, however, that I think it's disingenuous to say that he was unable to, that he was not shown up for work when all his access had been disabled. His card entry into the building had been disabled. He was told if you show up on the premises that security would be called because you don't have the proper credentials. No, I agree, but I think it is worth noting to the extent it is considered by this Court to note that his access was disabled and his computer was blocked. That's another thing that I think we need to mention. In terms of what happened here, in terms of the cover-up additionally, I think it's enough for purposes of jurisdiction that he was in fact blocked from his computer. I looked, looking at respondents and intervenors' briefing, consistent in that briefing they raised the issue that he claimed that Exxon had blocked his computer. Well, that's not true. We look at what he filed with the OSC. He asserts that the IRS was part of the, they were responsible for having blocked him from his computer. So all throughout the briefing that I read by respondents and intervenors, it says that he was claiming it was Exxon. It was Exxon who blocked him from his computer. So they're the bad guy here, not us. We didn't do it. But he claimed this entire way that the IRS was actually responsible for blocking him from his computer, which would be part of the cover-up that he's alleging. What about the retaliation claim that opposing counsel says is not actionable because the statute was passed after the action's in question and that it's non-retroactive? Well, uh, we do agree with counsel where she said that the WBPA is retroactive based on the reasonable belief standard. We agree with counsel. That's, I'm talking about the other counsel who argued that the retaliation under 2302 B-9 is not retroactive. And so you can't have a claim on that. Well, I think it's hard for me to argue one way or the other on that point because we're looking at cases that came out even before the WBPA was put into place in 2012. So that's something I would need to read further. I don't feel comfortable making that assertion because that's another thing here. All this case law that we're relying on predates the amendment of 2012. Now, I see that I'm about out of time. I'm going to thank this panel for their consideration. In sum, we would ask that this be remanded back to the Merit Systems Protection Board for consideration on the merits and any and other relief that the petitioner would be entitled to. Thank you for your time.